

**SO ORDERED.**

**SIGNED this 23 day of September, 2021.**

*Stephani W. Humrickhouse*

**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

---

### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF NORTH CAROLINA
### WILMINGTON DIVISION

IN RE:

**MICHAEL GENE MUSSELWHITE,**                    **CASE NO. 20-00928-5-SWH**

        **DEBTOR.**                                        **CHAPTER 13**

---

**JOSEPH A. BLEDSOE III,**
**TRUSTEE,**

        **PLAINTIFF,**

    **v.**                                          **ADVERSARY PROCEEDING**
                                                  **NO. 20-00142-5-SWH**

**FLAMINGO PROPERTIES, LLC,**
**FLAMINGO SOUTH, LLC, and**
**L. BRIAN CHESHIRE,**

        **DEFENDANTS.**

### ORDER DENYING MOTION TO DISMISS

The matter before the court is the Motion to Dismiss filed by the defendants on February 11, 2021. Dkt. 9. The defendants filed a Memorandum in Support of the Motion to Dismiss contemporaneously with the Motion to Dismiss. Dkt. 10. The plaintiff filed a Response in Opposition to the Motion to Dismiss on March 3, 2021. Dkt. 13. A hearing was held on March 9,

2021 in Wilmington, North Carolina. At the conclusion of the hearing, the court took the matter under advisement and invited the parties to file post-hearing briefs.

The plaintiff filed a post-hearing memorandum on March 23, 2021. Dkt. 15. The defendants filed a post-hearing memorandum on March 24, 2021. Dkt. 16. The matter is now ripe for determination.

## BACKGROUND

Michael Gene Musselwhite (the "debtor" or "Musselwhite") filed a voluntary petition under chapter 13 of the Bankruptcy Code on March 3, 2020. Joseph A. Bledsoe, III (the "trustee" or the "plaintiff") filed this adversary proceeding on December 13, 2020 against Flamingo Properties, LLC ("Flamingo Properties"), Flamingo South, LLC ("Flamingo South"), and L. Brian Cheshire ("Cheshire") (collectively, the "defendants"). The following causes of action are set forth in the complaint:

(1) Turnover of debt that is property of the estate pursuant to 11 U.S.C. § 542(b) against Flamingo Properties and Flamingo South,

(2) Avoidance of fraudulent transfers within 6 years of the petition date pursuant to 11 U.S.C. § 544(b)(1), using 28 U.S.C. §§ 3304(a)(1), 3306(a) of the Federal Debt Collection Practices Act ("FDCPA") as applicable law, against Flamingo Properties,

(3) Avoidance of fraudulent transfers within 6 years of the petition date pursuant to 11 U.S.C. § 544(b)(1), using 28 U.S.C. §§ 3304(a)(1), 3306(a) of the FDCPA as applicable law, against Flamingo South,

(4) Avoidance of fraudulent transfers within 10 years of the petition date pursuant to 11 U.S.C. § 544(b)(1), using 26 U.S.C. §§ 6502(a)(1), 6901(a)(1)(A) of the Internal Revenue Code ("IRC") and N.C. Gen. Stat. § 39-23.5(a) of the North Carolina Uniform

Voidable Transactions Act ("NC UVTA") as applicable law, against Flamingo Properties,

(5) Avoidance of fraudulent transfers within 10 years of the petition date pursuant to 11 U.S.C. § 544(b)(1), using 26 U.S.C. §§ 6502(a)(1), 6901(a)(1)(A) of the IRC and N.C. Gen. Stat. § 39-23.5(a) of the NC UVTA as applicable law, against Flamingo South,

(6) Recovery of avoided transfers pursuant to 11 U.S.C. § 550(a)(1) against Flamingo Properties, Flamingo South, and Cheshire,

(7) Recovery of avoided transfers pursuant to 11 U.S.C. § 550(a)(2) against Cheshire, and

(8) Objection to claim of Cheshire pursuant to 11 U.S.C. § 502(d).

The defendants filed a Motion to Dismiss on February 11, 2021 seeking dismissal with prejudice of the plaintiff's claims for avoidance and recovery of fraudulent transfers—the second, third, fourth, fifth, sixth, and seventh claims for relief.

The underlying facts of the transfers at issue have been recited by the Fourth Circuit Court of Appeals[1] as follows:

> From 2000 to 2014, Musselwhite ran four Smithfield's Chicken 'N Bar-B-Q restaurants in North Carolina's New Hanover County with his business partner, Brian Cheshire. To do this, Musselwhite and Cheshire created two sets of corporate entities, each of which they initially owned in equal shares: one set owned the Smithfield's franchises themselves; another set owned the properties on which the restaurants operated. The entities that owned the Smithfield's franchises were Whiteshire Foods, Inc. (Whiteshire); Leland-Hwy 17, Inc. (Leland); Shallotte-Hwy 17, Inc. (Shallotte); and Wilmington-17th Street, Inc. (Wilmington). For each of these respective entities, Musselwhite and Cheshire entered into Franchise Agreements with MARC [Mid-Atlantic Restaurant Corporation]. And the entities that owned the properties were Flamingo Properties, LLC, which owned the Whiteshire and Wilmington properties, and Flamingo South, Inc. (Wilmington). For both of these, Musselwhite and Cheshire entered into ownership agreements with each other. In short, Whiteshire, Leland, Shallotte, and Wilmington rented their restaurants' physical spaces from the Flamingo Companies. Within this scheme,

---

[1] See discussion *infra* on the Federal Court Action.

Musselwhite managed the restaurants' day-to-day operations, while Cheshire managed their finances.

Musselwhite and Cheshire ran these restaurants without incident until 2015. Early that year, David Harris, a MARC executive, informed them that MARC wished to operate their franchises itself. Musselwhite and Cheshire agreed with this proposal and so executed four agreements on behalf of Whiteshire, Leland, Shallotte, and Wilmington with MARC on February 27, 2015.

A few particulars of these agreements merit mention. First, all four agreements contained broad release clauses. Among other things, these clauses' workaday language released MARC from claims that Whiteshire, Leland, Shallotte, and Wilmington may have had against it if they accrued on or before February 27, 2015.

These agreements also transformed the companies' relationships with each other. As for Shallotte and Leland, they chose to terminate their existing franchisor/franchisee relationship with MARC when they executed their "Termination Agreement and Mutual Release" agreements (collectively, the "Termination Agreements"). J.A. 334, 340. Yet Whiteshire and Wilmington took a different tack. They executed "Franchise Agreement Amendment" agreements that only modified—not terminated—their existing Franchise Agreements with MARC (collectively, the "Amendment Agreements"), extending their franchisor/franchisee relationship until December 31, 2017, about a year and a half longer than originally planned. J.A. 346, 352.

And the Amendment Agreements worked one other noteworthy change. Under these agreements, Whiteshire and Wilmington would retain their franchise rights until August 2015, when they would turn them over to MARC. In exchange, MARC would continue to lease the physical space from the Flamingo Companies for a few years. Once these leases were up, MARC could choose to buy the properties themselves from Whiteshire and Wilmington for a substantial sum. Put otherwise, these Amendment Agreements were lucrative for Whiteshire and Wilmington, and thus for Musselwhite and Cheshire, twice over—offering both a lucrative income stream and an even more lucrative potential payout.

But around when these changes were made, Musselwhite and MARC's relationship deteriorated. As MARC puts it, Musselwhite mismanaged the restaurants, resulting in not only declining sales but also unsanitary conditions. In fact, Musselwhite's behavior prompted the four agreements, MARC says. Tensions boiled over around May 23, 2015, when Musselwhite and Harris fought at the Whiteshire restaurant. Harris, who Musselwhite says stands at over six feet tall and regularly carries a pistol, arrived at that restaurant and began disparaging Musselwhite's managerial acumen and threatening to terminate both the Whiteshire and Wilmington Franchise Agreements—and ultimately physically barred Musselwhite from the restaurant's premises. And Harris's threat apparently came to pass: A few days later, on May 26, 2015, MARC terminated its Franchise Agreements with

> Whiteshire and Wilmington by letters. In these letters, MARC cited the restaurants'
> unprofitability, their unsanitary conditions, and other operational deficiencies as its
> reasons for terminating the agreements.
>
> This fracas irreparably changed Musselwhite and Cheshire's relationship too. As
> Musselwhite tells it, Harris began pressuring Cheshire to end his business
> ventures—that is, his co-ownership of Whiteshire and Wilmington—with
> Musselwhite, claiming that Musselwhite ineptly managed those restaurants. What's
> more, MARC also claimed that the Amendment Agreements—and their benefits—
> would not survive if Musselwhite remained a co-owner of the Flamingo
> Companies. Cheshire then spoke to Musselwhite and explained that they would
> receive "nothing" unless Musselwhite divested himself from the Flamingo
> Companies "on paper." J.A. 19. So, three days after MARC ended its relationship
> with Whiteshire and Wilmington, Cheshire bought out Musselwhite's share in the
> Flamingo Companies for $375,000 (hereinafter, the "Buyout Agreement").

*Musselwhite v. Mid-Atl. Rest. Corp.*, 809 Fed. App'x 122, 123-25 (4th Cir. 2020) (unpublished)

(per curiam).

The plaintiff alleges that in the agreements dated March 29, 2015, the debtor transferred

all of his membership interests in Flamingo Properties and Flamingo South back to the respective

LLCs. As a result of these assignments, Cheshire became the 100% owner and single member of

the Flamingo Companies. The plaintiff contends that the assignment of the debtor's membership

interest in Flamingo Properties (the "Flamingo Properties Transfer") and the assignment of the

debtor's membership interest in Flamingo South (the "Flamingo South Transfer") are avoidable

pursuant to 11 U.S.C. § 544(b)(1) and seeks a monetary judgment against the defendants in the

amount of the value of the avoided transfers, plus pre-judgment interest.

Musselwhite and the defendants have been involved in other litigation relating to the same

underlying facts of these causes of action. On January 26, 2016, Musselwhite filed an action in the

Superior Court Division of New Hanover County, North Carolina against all three defendants

named in this action for breach of contract, specific performance, fraud and misrepresentation,

constructive fraud, breach of fiduciary duty, unjust enrichment, constructive trust, unfair and

deceptive trade practices, notice of *lis pendens*, and breach of implied covenant of good faith and fair dealing (the "State Court Action").

On July 2, 2016, Flamingo Properties and Flamingo South's motion to dismiss all claims against those two defendants was allowed. Cheshire filed an answer and counterclaim asserting the affirmative defenses of accord and satisfaction/release, estoppel, waiver, failure to mitigate, and offset, and asserted a counterclaim against the debtor for breach of contract and breach of fiduciary duty. Musselwhite filed an amended complaint asserting additional claims against Cheshire for fraud in the inducement, mutual mistake, unilateral mistake, and substantive and procedural unconscionability.

A trial was held in the State Court Action on February 12, 2018. At the close of Musselwhite's evidence, the court granted Cheshire's motion for directed verdict and dismissed Musselwhite's claims with prejudice. Dkt. 10, Ex. X. The trial court concluded that the fraud, fraud in the inducement, and misrepresentation claims failed because Musselwhite did not rely on Cheshire's statements but instead relied on the statements of Harris. Dkt. 10, Ex. X. The following day, Cheshire voluntarily dismissed his counterclaims. Musselwhite appealed the order dismissing the claims to the North Carolina Court of Appeals, and on July 2, 2019, the North Carolina Court of Appeals affirmed. *Musselwhite v. Cheshire*, 831 S.E.2d 367 (N.C. Ct. App. 2019).

While the appeal was pending in the State Court Action, on May 23, 2018, Musselwhite, on behalf of himself and Whiteshire Foods Inc., Leland-Hwy. 17 Inc., Shallotte-Hwy. 17 Inc., and Wilmington-17th Street, Inc., filed a complaint against Mid-Atlantic Restaurant Corporation ("MARC"), Cary Keisler, Inc., SCNB, Inc., Gregory Moor, Smithfield's of Smithfield, Inc., Smithfield's of Clayton, Inc., David Harris, Cheshire, Flamingo Properties, and Flamingo South in the United States District Court for the Eastern District of North Carolina for tortious

interference with contract, breach of contract, breach of implied covenant of good faith and fair dealing, breach of fiduciary duty, fraud, constructive fraud, unjust enrichment, negligent misrepresentation, unfair and deceptive trade practices, violation of RICO, violation of Sherman Antitrust Act and the Clayton Act, and civil conspiracy (the "Federal Court Action"). The plaintiffs in that case filed an amended complaint asserting no claims against Cheshire but asserting additional claims against the other defendants for negligent infliction of emotional distress and intentional infliction of emotional distress.

The Federal Court Action was dismissed by order entered on October 29, 2018. Dkt. 10, Ex. BB. The district court found that Musselwhite was collaterally estopped from bringing claims of tortious interference and civil conspiracy against defendant Harris and that the other claims brought by the plaintiffs all arose prior to February 27, 2015 and thus were barred by the release language in the termination agreements. Dkt. 10, Ex. BB.

Musselwhite appealed the dismissal to the Fourth Circuit Court of Appeals. On April 15, 2020, in an unpublished opinion, the Fourth Circuit reversed the dismissal of the Federal Court Action and remanded. *Musselwhite v. Mid-Atl. Rest. Corp.*, 809 F. App'x 122 (4th Cir. 2020) (unpublished) (per curiam). In part, the Fourth Circuit concluded that Musselwhite was not collaterally estopped from bringing a tortious interference with contract claim against MARC. *Id.* at 130. The Fourth Circuit found that although the "state-court judgment conclusively answers whether Cheshire fraudulently induced Musselwhite to enter the Buyout Agreement or otherwise wrongfully lied to him while buying out his stakes in the Flamingo Companies[,] it does not conclusively answer whether MARC, through Harris, acted maliciously in any way." *Id.* at 129. The Federal Court Action is presently pending in the United States District Court for the Eastern District of North Carolina.

## DISCUSSION

### I.    Standard of Review

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, as made applicable to this adversary proceeding through Rule 7012 of the Federal Rules of Bankruptcy Procedure, a party may move to dismiss a complaint for failure to state a claim upon which relief may be granted. "The purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint." *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999) (citing *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); Fed. R. Bankr. P. 7008. The complaint must contain sufficient factual matter that when accepted as true, "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

### II.    The *Rooker-Feldman* doctrine*, res judicata*, and collateral estoppel

As a threshold matter, the defendants argue that this court lacks the ability to hear the fraudulent transfer claims under either the *Rooker-Feldman* doctrine or under related preclusion principles of *res judicata* and collateral estoppel because the factual allegations have been completely litigated to a final judgment in the state court.

Under the *Rooker-Feldman* doctrine, lower federal courts are precluded "from exercising appellate jurisdiction over final state-court judgments." *Thana v. Bd. of License Comm'rs for Charles Cnty., Md.*, 827 F.3d 314, 319 (2016) (quoting *Lance v. Dennis*, 546 U.S. 459, 463 (2006)). The *Rooker-Feldman* doctrine arises from federal jurisdictional statutes and "stands for the unremarkable proposition that federal district courts are courts of original, not appellate jurisdiction." *Gruntz v. Cnty. of Los Angeles (In re Gruntz)*, 202 F.3d 1074, 1078 (9th Cir. 2000).

The doctrine is limited to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005). It does not override or supplant preclusion doctrines or allow federal courts to stay or dismiss proceedings in deference to state court actions. *Id.*

The Ninth Circuit has recognized that final state court judgments are not always preclusive in bankruptcy courts. *Gruntz*, 202 F.3d at 1079. "[B]ankruptcy courts are empowered to avoid state judgments, *see, e.g.*, 11 U.S.C. §§ 544, 547, 548, 549; to modify them, *see, e.g.*, 11 U.S.C. §§ 1129, 1325; and to discharge them, *see, e.g.*, 11 U.S.C. §§ 727, 1141, 1328." *Id.* This does not mean that the *Rooker-Feldman* doctrine never applies in bankruptcy proceedings, but rather that "*Rooker-Feldman* does not allow a state court to interfere with the core administrative functions of an operative bankruptcy." *Id.* at 1084.

Although the underlying facts of this adversary proceeding and the state court litigation may be the same, the plaintiff is not asking this court to review a final state court judgment. The state court judge ultimately found that Musselwhite had no cause of action for breach of contract, specific performance, fraud and misrepresentation, constructive fraud, breach of fiduciary duty, unjust enrichment, constructive trust, unfair and deceptive trade practices, notice of *lis pendens*, or breach of implied covenant of good faith and fair dealing against Flamingo Properties, Flamingo South, or Cheshire. That judge also found that Musselwhite did not have any cause of action against Cheshire for fraud in the inducement, mutual mistake, unilateral mistake, and substantive and procedural unconscionability.

The causes of action in this adversary proceeding are substantively different from those brought in the State Court Action. The claims at issue are bankruptcy-specific causes of action

created by §§ 544(b)(1) and 550 of the Bankruptcy Code. No judgment was rendered in the State Court Action regarding the avoidance and recovery of fraudulent transfers. By hearing these fraudulent transfer claims, this court is in no way reviewing the state court's judgment on the other causes of action. The limited nature of the *Rooker-Feldman* doctrine does not strip this court of jurisdiction to hear claims under §§ 544 and 550 of the Bankruptcy Code, and the court finds that the *Rooker-Feldman* doctrine has no application to this adversary proceeding.

The defendants also argue that either *res judicata* or collateral estoppel precludes the court from hearing the fraudulent transfer claims. The defendants argue that Musselwhite had a full and complete opportunity to litigate his claim involving the alleged unconscionability of the agreement and the alleged disparity between the net value of the real property owned and what Musselwhite would receive under the Agreement. For the reasons below, the court finds that neither of these doctrines applies to this adversary proceeding.

"Federal courts must give the same preclusive effect to a state court judgment as the forum that rendered the judgment would have given it." *Sartin v. Macik*, 535 F.3d 284, 287 (4th Cir. 2008). *Res judicata*, or claim preclusion, bars the re-litigation of a claim if there is "(1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits." *Clodfelter v. Republic of Sudan*, 720 F.3d 199, 210 (4th Cir. 2013).

The fraudulent transfer and avoidance causes of action cannot be precluded under the doctrine of *res judicata*. There were no prior causes of action under §§ 544(b)(1) and 550 because these are bankruptcy specific claims. As discussed in further detail below, however, § 544(b)(1) does not create a substantive cause of action itself, but it permits a trustee to avoid transfers under "applicable law." In the complaint, the trustee alleges that the FDCPA, the NC UVTA, and the

IRC may be used as "applicable law" under § 544(b)(1). No claims were brought in either the State Court Action or the Federal Court Action under any of those statutes. Thus, this adversary proceeding is not a re-litigation of any causes of action.

Collateral estoppel, also known as issue preclusion, forecloses the re-litigation of issues of fact or law. *Kloth v. Microsoft Corp. (In re Microsoft Corp. Antitrust Litig.)*, 355 F.3d 322, 326 (4th Cir. 2004). Under North Carolina law, a party must show that (1) the issue in question was identical to an issue actually litigated and necessary to the judgment, (2) that the prior action resulted in a final judgment on the merits, and (3) that the present parties are the same as, or in privity with, the parties to the earlier action. *Sartin*, 535 F.3d at 288 (citing *Thomas M. McInnis & Assocs., Inc. v. Hall*, 349 S.E.2d 552, 557 (N.C. 1986)). With regard to the first requirement, the North Carolina Supreme Court has held that four criteria must be satisfied to meet this element:

> (1) the issues must be the same as those involved in the prior action, (2) the issues must have been raised and actually litigated in the prior action, (3) the issues must have been material and relevant to the disposition of the prior action, and (4) the determination of the issues in the prior action must have been necessary and essential to the resulting judgment.

*Id.* (quoting *State v. Summers*, 528 S.E.2d 17, 20 (N.C. 2000)).

Collateral estoppel does not preclude the litigation of any issues in this adversary proceeding because the chapter 13 trustee, the plaintiff in this adversary proceeding, was not a party to the prior lawsuits, nor was the trustee in privity with the debtor. *See Ingalls v. Erlewine (In re Erlewine)*, 349 F.3d 205, 210 (5th Cir. 2003) (holding that the trustee was not in privity with the debtor because their interests were quite distinct). The debtor was a party to the State Court Action and the Federal Court Action, but the chapter 13 trustee was not. Thus, the court's real inquiry is whether the debtor and the chapter 13 trustee would be deemed in privity for purposes of collateral estoppel.

"In determining the preclusive effect of a state-court judgment, the federal courts must, as a matter of full faith and credit, apply the forum state's law of collateral estoppel." *In re McNallen*, 62 F.3d 619, 624 (4th Cir. 1995). Although no one definition of privity can be applied in all cases, the prevailing definition of "privity" in North Carolina is that privity "denotes a mutual or successive relationship to the same rights of property." *Whitacre Partnership v. Biosignia, Inc.*, 591 S.E.2d 870, 893 (N.C. 2004) (quoting *State ex. rel. Tucker v. Frinzi*, 474 S.E.2d 127, 130 (N.C. 1996)). In making the determination of whether the parties are in privity, the courts "look beyond the nominal party whose name appears on the record as plaintiff and consider the legal questions raised as they may affect the real party or parties in interest." *Id.* (quoting *Summers*, 528 S.E.2d at 21). "Privity involves a person so identified in interest with another that he represents the same legal right." *Frinzi*, 474 S.E.2d at 130 (quoting 47 Am. Jur. 2d Judgments § 663 (1995)). Fourth Circuit law also dictates a similar test for privity which is "whether the interests of one party are so identified with the interests of another that representation by one party is representation of the other's legal right." *Weinberger v. Tucker*, 510 F.3d 486, 491 (4th Cir. 2007).

The trustee represents all unsecured creditors of the bankruptcy estate. *In re Marlar*, 267 F.3d 749, 754 (8th Cir. 2001) (holding that although *res judicata* could bar a specific creditor from bringing a fraudulent transfer action that had previously been litigated, the trustee was not barred from relying on the rights of other unsecured creditors in bringing the action); *see also In re Fordu*, 201 F.3d 693, 705-06 (6th Cir. 1999) (holding that the trustee was not in privity with the debtor). In asserting a claim under § 544(b)(1), the trustee may avoid a transfer that is voidable by "a creditor holding an unsecured claim." 11 U.S.C. § 544(b)(1). Although in certain capacities the trustee stands in the shoes of the debtor, when the trustee seeks to avoid transfers of property under

chapter 5, the trustee is stepping into the shoes of the creditors. *In re Helms*, 467 B.R. 374, 383 (Bankr. W.D.N.C. 2012).[2]

The court finds that in this situation, the chapter 13 trustee is not in privity with the debtor. The trustee is not representing the same legal right in this action that the debtor was in the prior lawsuits. Instead, the trustee is pursuing these fraudulent conveyance actions for the benefit of the creditors. Even if identical issues were litigated and actually resolved in the state court or federal court proceedings, the chapter 13 trustee and the debtor's creditors were not parties in those suits. The chapter 13 trustee has not had an opportunity to litigate these issues or facts in a prior proceeding.

Additionally, the court does not believe that any issue in question here is identical to an issue actually litigated and necessary to a previous judgment. Under the portion of the FDCPA that the trustee is invoking, a transfer is fraudulent if the debtor made the transfer without receiving reasonably equivalent value in exchange and the debtor is insolvent at that time or becomes insolvent as a result of the transfer. 28 U.S.C. § 3304(a)(1). Although the state court concluded that the fraud, fraud in the inducement, and misrepresentation claims failed and made factual findings to support that conclusion, fraud is not an issue in this action. Neither the state nor the federal court made a determination necessary to the judgment regarding "reasonably equivalent value" or the debtor's insolvency. Therefore, the court finds that neither *res judicata* nor collateral estoppel bars the litigation of these claims and issues.

---

[2] One court within the Fourth Circuit has found that a trustee is in privity with the debtor, such that collateral estoppel would apply in a preference action before the bankruptcy court to preclude the re-litigation of issues determined in an interpleader action in state court. *In re Professional Coatings (N.A.), Inc.*, 210 B.R. 66 (Bankr. E.D. Va. 1997). That case was decided under Virginia law where the court made "a difficult choice as to which line of cases to follow in order to prognosticate how the Virginia courts would decide the issue." *Id.* at 84.

### III.    Avoidance Claims

#### A.  Trustee's use of avoidance powers

Section 544(b)(1) of the Bankruptcy Code provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under *applicable law* by a *creditor holding an unsecured claim* that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b)(1) (emphasis added). This statute allows a trustee to "step into the shoes" of an unsecured creditor to recover transfers that the creditor would have been able to recover under applicable law outside of bankruptcy. *Hillen v. City of Many Trees, LLC (In re CVAH, Inc.)*, 570 B.R. 816, 823 (Bankr. Idaho 2017).

Section 544(b)(1) does not itself create a substantive cause of action, but rather it allows a trustee in certain circumstances to assume causes of actions under "applicable law." *Field v. Montgomery Cnty. (In re Anton Motors, Inc.)*, 177 B.R. 58, 64 (Bankr. D. Md. 1995). Most often, § 544(b) is used to recover transfers that would be voidable under state law. *Wagner v. Ultima Homes, Inc. (In re Vaughan Co.)*, 498 B.R. 297, 302 (Bankr. D.N.M. 2013). The NC UVTA, which is commonly used as the "applicable law" in this state, only has a 4-year lookback period. N.C. Gen. Stat. § 39-23.9. The 6-year and 10-year lookback periods of the FDCPA and the IRC, respectively, are critical to the trustee's fraudulent transfer claims because the alleged fraudulent transfers occurred on March 29, 2015, close to five years prior to the date that the debtor filed the bankruptcy petition on March 5, 2020.

The second and third causes of action assert that the trustee can step into the shoes of the IRS as the "creditor holding an unsecured claim" and use the FDCPA (28 U.S.C. §§ 3304(a)(1) and 3306(a)) as "applicable law" under § 544(b)(1) of the Code to avoid alleged fraudulent

transfers that occurred within 6 years of the petition date.[3] The fourth and fifth causes of action assert that the trustee can step into the shoes of the IRS as the "creditor holding an unsecured claim" and use the NC UVTA (N.C. Gen. Stat. § 39-23.5(a)), in conjunction with the IRC (26 U.S.C. §§ 6502(a)(1) and 6901(a)(1)(A)), as "applicable law" under § 544(b)(1) of the Code to avoid the alleged fraudulent transfers that occurred within 10 years of the petition date.[4]

In their motion to dismiss the second and third causes of action, the defendants contend that the trustee cannot step into the shoes of the IRS as a "creditor holding an unsecured claim" and use the FDCPA as "applicable law" under § 544 because it would impermissibly modify the operation of title 11. With regard to the fourth and fifth causes of action, the defendants argue that the trustee cannot step into the shoes of the IRS as a "creditor holding an unsecured claim" to allow the trustee to bring the NC UVTA claim outside of the 4-year statute of limitations.

The court will first address whether the trustee can step into the shoes of the IRS to use the 10-year collection period of the IRC in place of the 4-year statute of limitations of the NC UVTA. Then, the court will discuss whether the trustee can step into the shoes of the IRS to use FDCPA and its 6-year statute of limitations as "applicable law" under § 544(b)(1).

> **1. The trustee can step into the shoes of the IRS as a creditor holding an allowed, unsecured claim and utilize the 10-year lookback period of the IRC.**

The fourth and fifth causes of action assert that the trustee can step into the shoes of the IRS as an unsecured creditor and utilize § 39-23.5(a) of the NC UVTA in tandem with §§ 6502(a)(1) and 6901(a)(1)(A) of the IRC as "applicable law" under § 544(b)(1) of the

---

[3] The second cause of action is asserted against Flamingo Properties, and the third cause of action is asserted against Flamingo South.

[4] The fourth cause of action is asserted against Flamingo Properties, and the fifth cause of action is asserted against Flamingo South.

Bankruptcy Code. For the reasons stated below, the court finds that the trustee can step into the shoes of the IRS and utilize the longer 10-year lookback period of the IRC.

In this adversary proceeding, the trustee cannot use the NC UVTA on its own because the transfers fall outside of the 4-year lookback period of the NC UVTA. N.C. Gen. Stat. § 39-23.9. Instead, the trustee takes the position that he can step into the shoes of the IRS and use the longer 10-year lookback period contained in the IRC, in conjunction with the NC UVTA, to avoid the transfers. The court must ascertain if the trustee can step into the shoes of the IRS as the "creditor holding an unsecured claim that is allowable under section 502," and if by doing so whether the trustee is enabled to use the 10-year collection period of the IRC in place of the 4-year statute of limitations of the NC UVTA.

Section 544(b)(1) of the Code "enables a trustee to do in a bankruptcy proceeding what a creditor would have been able to do outside of bankruptcy—except the trustee will recover the property for the benefit of the estate." *Ebner v. Kaiser (In re Kaiser)*, 525 B.R. 697, 708 (Bankr. N.D. Ill. 2014) (quoting *In re Equip. Acquisition Res., Inc.*, 742 F.3d 743, 746 (7th Cir. 2014)). The trustee's power under § 544(b)(1) is derivative of that of an actual unsecured creditor under the applicable law. *Id.* "[I]f any unsecured creditor could reach an asset of the debtor outside bankruptcy, the Trustee can use § 544(b) to obtain that asset for the estate." *Id.* (quoting *In re Leonard*, 125 F.3d 543, 544 (7th Cir. 1997)). Section 544(b)(1) contains no restrictions on which unsecured creditor the trustee may choose as the golden creditor.[5] *Id.* at 711. The trustee must choose the creditor wisely because the trustee is subject to the defenses that the chosen creditor would be subject to itself. *Id.* (citing *Equip. Acquisition Res., Inc.*, 742 F.3d at 751).

---

[5] The triggering creditor, the one who the trustee chooses to step into its shoes under § 544(b)(1) as the "creditor holding an unsecured claim that is allowable," is informally referred to as the "golden creditor." *See Kaiser*, 525 B.R. at 703-04.

The starting point for the court is to identify whether the creditor chosen by the trustee is a "creditor holding an unsecured claim that is allowable under section 502." Then, the court must determine if that creditor would have the requisite cause of action under "applicable law" to be able to avoid these transfers.

It is undisputed that the IRS holds an allowed unsecured claim in this bankruptcy case. The IRS filed a proof of claim (claim #4) on March 24, 2020 in the amount of $160,609.68. The debtor objected to the proof of claim on May 29, 2020. On August 6, 2020, the IRS amended its proof of claim. The amended proof of claim asserts that the IRS has a claim in the amount of $65,204.35 ($28,379.31 of that amount being secured and $36,825.04 of that amount being unsecured). No objection has been filed to the amended claim.

Outside of bankruptcy, the IRS would have the ability to bring a cause of action under the NC UVTA against a transferee of a taxpayer's property. Section 6901(a)(1)(A)[6] of the IRC establishes a procedure for tax collection, authorizing the collection of "[t]he liability, at law or in equity, of a transferee of property. . . of a taxpayer." 26 U.S.C. § 6901(a)(1)(A); *see also Kaiser*, 525 B.R. at 709. The liability of the transferee would be governed by the state fraudulent transfer law. *Kaiser*, 525 B.R. at 710.

---

[6] (a) Method of Collection

The amounts of the following liabilities shall, except as hereinafter in this section provided, be assessed, paid, and collected in the same manner and subject to the same provisions and limitations as in the case of the taxes with respect to which the liabilities were incurred:

(1) Income, Estate, and Gift Taxes

    (A) Transferees

        The liability, *at law or in equity*, of a transferee of property—

        (i) of a taxpayer in the case of a tax imposed by subtitle A (relating to income taxes),

        (ii) of a decedent in the case of a tax imposed by chapter 11 (relating to estate taxes), or

        (iii) of a donor in the case of a tax imposed by chapter 12 (relating to gift taxes),

        in respect of the tax imposed by subtitle A or B.

26 U.S.C. § 6901(a)(1)(A) (emphasis added).

17

If the IRS sought to collect taxes using the NC UVTA, the action would not be governed by the state statute of limitations. *See Vaughan Co.*, 498 B.R. at 303 (citing *U.S. v. Spence*, 2000 WL 1715216, at *3 (10th Cir. 2000)). According to the doctrine of *nullus tempus occurrit regi*, the United States (including the IRS) is not bound by state statutes of limitations. *Id.* at 303-04 (citing *U.S. v. Summerlin*, 310 U.S. 414, 416 (1940)). This doctrine originates from the principle that "no time runs against the king." *Id.* The plaintiff's position is that he is not bound by the 4-year state statute of limitations of the NC UVTA, but instead, would have a 10-year lookback period under 26 U.S.C. § 6502(a)(1), just like the IRS outside of bankruptcy.[7]

The majority of courts that have directly addressed the issue of whether § 544(b) permits a trustee to step into the shoes of the IRS have found that § 544(b) allows a trustee to do so. *See, e.g., Vieira v. Gaither (In re Gaither)*, 595 B.R. 201 (Bankr. D.S.C. 2018); *Mukamal v. Citibank N.A. (In re Kipnis)*, 555 B.R. 877 (Bankr. S.D. Fla. 2016). Those courts reason that the issue is a task of statutory construction and that the plain language of § 544(b)(1) is clear. *Gaither*, 595 B.R. at 209. Section 544(b)(1) imposes no limitation on the type of unsecured creditor a trustee can choose as a triggering creditor nor any limitation on the "applicable law" that may be used. *Kipnis*, 555 B.R. at 882 (citing *Kaiser*, 525 B.R. at 771).

On the other side, one court has found that, by enacting § 544(b), Congress did not "intend[ ] to vest sovereign powers in a bankruptcy trustee and thereby immunize her from the strictures of state law in the pursuit of her private interests." *Vaughan Co.*, 498 B.R. at 304. The *Vaughan* court reasoned that although the trustee could stand in the shoes of any unsecured creditor

---

[7] (a) Length of period

      Where the assessment of any tax imposed by this title has been made within the period of limitation properly applicable thereto, such tax may be collected by levy or by a proceeding in court, but only if the levy is made or the proceeding begun—

      (1)  within 10 years after the assessment of the tax . . . .

26 U.S.C. § 6502(a)(1).

to set aside transfers, it did not necessarily follow that by standing in the shoes of the IRS that the trustee was immunized from state statutes of limitations. *Id.* The *Vaughan* court was concerned that if the trustee could use the 10-year lookback period of the IRC, that usage would effectively eviscerate the 4-year lookback period of the state fraudulent transfer law. *Id.* at 305.

Other courts have criticized the analysis of the *Vaughan* court. *See, e.g., CVAH, Inc.*, 570 B.R. at 835; *Kipnis*, 555 B.R. at 882; *Kaiser*, 525 B.R. at 773. The *Kaiser* court found that because § 544(b)(1) was clear, the court did not need to look at the underlying policy concerns. *Kaiser*, 525 B.R. at 713-14. The *Kaiser* court noted that even if the court were inclined to look at the underlying policy concerns – primarily the concern that allowing the trustee to use the 10-year lookback period of the IRC would eliminate the state statute of limitations in most cases – those concerns were unavailing. *Id.* at 712. The *Kaiser* court was of the opinion that the slippery slope argument was a logical fallacy, disproven by actual experience. *Id.* The court in *Kipnis* did not adopt the same conclusion as *Kaiser* that the ruling would have limited impact, yet the court agreed that the policy concerns were not dispositive of the issue. *Kipnis*, 555 B.R. at 882. The court found that even though the policy concerns were valid, the court was not permitted to read such a limitation into the text of § 544(b). *Id.*

This court agrees with the majority of courts finding that there is no prohibition against the trustee stepping into the shoes of the IRS. The court must begin with the language of the statute itself. *Gaither*, 595 B.R. at 209 (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)). Under section 544(b)(1), "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law *by a creditor holding an unsecured claim that is allowable* under section 502 of this title . . . ." 11 U.S.C. § 544(b)(1) (emphasis added). The language of § 544(b) does not limit which unsecured

19

creditor the trustee may choose as the "creditor holding an unsecured claim." *Kaiser*, 525 B.R. at 711. The plain language of § 544(b)(1) is not restrictive, and the court sees no reason to limit the trustee from choosing the IRS as the golden creditor, and thereby be subject to the same statute of limitations that the IRS would be subject to outside of bankruptcy. It is not necessary for the court to address whether this outcome was the intent of Congress or any other underlying policy concerns because the plain language of the statute clearly permits the trustee to choose any unsecured creditor holding an allowed claim as the golden creditor.

The defendants also contend that the Fourth Circuit's decision in *Schlossberg v. Barney*, 380 F.3d 174 (4th Cir. 2004), prevents the trustee from stepping into the shoes of the IRS. In *Schlossberg*, the Fourth Circuit examined whether "§ 544(a)(2) vests a trustee with the rights and powers of the IRS as a hypothetical creditor to penetrate the entireties exemption for the benefit of the individual creditors of the debtor." *Id.* at 177. To support their contention, the defendants point to the court's statements that "we do not believe that Congress intended a bankruptcy trustee to wield the extraordinary collection powers of the federal government," and that "[n]othing in the text or legislative history of the strong-arm clause suggests that Congress intended a bankruptcy trustee to be capable of invoking the 'sovereign prerogative' to attach property that ordinary secured creditors could not reach." *Id.* at 181.

In *Schlossberg*, the Fourth Circuit was looking at a different issue than the one before this court. Significantly, the trustee was pursuing a claim under § 544(a)(2), which allows a trustee to step into the shoes of a hypothetical "creditor that extends credit." The IRS was not an actual creditor holding a claim in that case. *See also Gaither*, 595 B.R. at 207 (distinguishing *Schlossberg* because "[s]ections 544(a) and 544(b) are different and should be analyzed separately"). The

Fourth Circuit ultimately held that the IRS was not a "creditor that extends credit" and affirmed on those grounds. *Schlossberg*, 380 F.3d at 177.

Additionally, the trustee in *Schlossberg* argued that he could use § 544(a)(2) to reach entireties property despite the exemption created by § 522(b)(2). *Id.* at 176. The court was concerned that allowing a trustee to use the strong-arm powers in this way would eviscerate the tenancies by the entireties exemption that is explicitly recognized by the Bankruptcy Code. *Id.* at 181-82. The court concluded that "if a trustee could assert the rights of a hypothetical federal tax lien holder, no state law exemption would exempt property from the estate, and § 522(b)(2)(B) would be superfluous." *Id.* at 182. The Fourth Circuit's opinion in *Schlossberg* is specific to § 544(a) and the tenancies by the entireties exemption, and it does not inform the court nor is it dispositive of the issue before it now. Thus, the court finds that the trustee may step into the shoes of the IRS as a creditor holding an allowed, unsecured claim and utilize the 10-year lookback period provided for by the IRC.

### 2. The trustee may step into the shoes of the IRS to bring a cause of action under the FDCPA as the "applicable law."

The second and third causes of action allege that the trustee can step into the shoes of the IRS as an unsecured creditor and utilize 28 U.S.C. §§ 3304(a)(1)[8] and 3306(a)[9] of the FDCPA as

---

[8] (a) Debt Arising Before Transfer.—Except as provided in section 3307, a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States which arises before the transfer is made or the obligation is incurred if—

    (1)

        (A) the debtor makes the transfer or incurs the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation; and
        (B) the debtor is insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation. . . .

28 U.S.C. § 3304(a)(1).

[9] (a) In General.—In an action or proceeding under this subchapter for relief against a transfer or obligation, the United States, subject to section 3307 and to applicable principles of equity and in accordance with the Federal Rules of Civil Procedure, may obtain—

"applicable law" under § 544(b)(1) of the Code to avoid fraudulent transfers made in the 6 years prior to the petition date. As discussed below, the court finds that the trustee has appropriately brought these claims.

First, for the same reasons as those discussed above, the court finds that the trustee may step into the shoes of the IRS as the golden creditor. To bring a claim under the FDCPA, the trustee must be able to step into the shoes of the United States. Section 3306 of the FDCPA provides that "the United States . . . may obtain . . . avoidance of the transfer or obligation to the extent necessary to satisfy the debt to the United States." 28 U.S.C. § 3306(a).[10] The IRS is an allowed, unsecured creditor in this case. Nothing in the plain language of § 544(b)(1) prohibits the trustee from stepping into the shoes of the IRS as an actual, unsecured creditor and exercising the powers available to the IRS. Outside of bankruptcy, the IRS could bring a claim under the FDCPA.

Finding that the trustee can step into the shoes of the IRS as the golden creditor, the court must next determine if the FDCPA can be used as the "applicable law" under § 544(b)(1). The defendants argue that treating the FDCPA as "applicable law" would impermissibly modify the operation of the Bankruptcy Code. For the reasons below, the court finds that the FDCPA can be used as "applicable law" under § 544(b)(1) and that doing so does not impermissibly modify the operation of the Bankruptcy Code.

---

(1) avoidance of the transfer or obligation to the extent necessary to satisfy the debt to the United States;
(2) a remedy under this chapter against the asset transferred or other property of the transferee; or
(3) any other relief the circumstances may require.

28 U.S.C. § 3306(a).

[10] The court in *Gaither* concluded that because the trustee can exercise the powers available to one creditor to entirely avoid a transfer for the benefit of the estate, the limitation on recovery that avoidance is only "to the extent necessary to satisfy the debt of the United States" is not a limitation under § 544(b). *Gaither*, 595 B.R. at 206 (citing *Moore v. Bay*, 284 U.S. 4 (1931)). This issue was not addressed by the parties, and so the court will likewise not address it at this time.

As previously outlined, section 544(b)(1) does not itself create a substantive cause of action, but rather it allows a trustee in certain circumstances to assume causes of actions under "applicable law." *Field v. Montgomery Cnty. (In re Anton Motors, Inc.)*, 177 B.R. 58, 64 (Bankr. D. Md. 1995). Most commonly, trustees use state fraudulent transfer law as the "applicable law." The FDCPA, however, has a longer 6-year lookback period, in comparison to the 4-year lookback period of the NC UVTA. *Compare* 28 U.S.C. § 3306(b) *with* N.C. Gen. Stat. § 39-23.9.

Courts are split on the issue of whether the FDCPA can be used as "applicable law." Most courts have held that the FDCPA can be used as "applicable law" under § 544(b). *See Vieira v. Gaither (In re Gaither)*, 595 B.R. 201 (Bankr. D.S.C. 2018); *Hillen v. City of Many Trees, LLC (In re CVAH, Inc.)*, 570 B.R. 816 (Bankr. Idaho 2017). Those courts have found that "applicable law" is a broad term that does not limit a plaintiff to only using a state's fraudulent transfer law as the "applicable law." *Gaither*, 595 B.R. at 214.

At least one circuit court has held that the FDCPA cannot be used as "applicable law." *MC Asset Recovery LLC v. Commerzbank A.G. (In re Mirant Corp.)*, 675 F.3d 530 (5th Cir. 2012). In *Mirant*, the Fifth Circuit looked at 28 U.S.C. § 3003(c)[11] and found that treating the FDCPA as "applicable law" would impermissibly modify the operation of title 11. *Id.* at 535. The court reasoned that, although the legislative history of the FDCPA was not dispositive, a statement of Representative Brooks that the FDCPA would have absolutely no effect on the Bankruptcy Code supported the conclusion that the FDCPA was not "applicable law" under § 544(b) of the Code. *Id.* at 535-36.

The plain language of § 544(b) does not exclude the FDCPA from being used as the substantive "applicable law." "Applicable law" should be construed broadly as § 544(b) contains

---

[11] "This chapter shall not be construed to supersede or modify the operation of–(1) title 11 . . . ." 28 U.S.C. § 3003(c).

no limiting language. *CVAH, Inc.*, 570 B.R. at 825. This conclusion is consistent with the Supreme Court's holding in *Patterson* that the phrase "applicable nonbankruptcy law," as found in § 541 of the Code, does not refer exclusively to state law because the statute contains no limitation on the source of the law. *Patterson v. Shumate*, 504 U.S. 753, 757 (1992). The court declines to follow the Fifth Circuit in finding that the using the FDCPA as "applicable law" impermissibly modifies the operation of the Bankruptcy Code. The plain language of the statute is unambiguous, and therefore any reliance upon legislative history is unwarranted. The court holds that the FDCPA may be used as "applicable law" under § 544(b).

### B.  The plaintiff sufficiently plead "reasonably equivalent value" and "insolvency."

As another basis for dismissal of the avoidance claims, the defendants argued that the plaintiff did not plausibly plead a lack of "reasonably equivalent value" or the debtor's alleged "insolvency." The court finds that the plaintiff has sufficiently done so.

As previously stated, to survive a motion to dismiss, a complaint must contain sufficient facts to "state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). While a complaint does not need detailed factual allegations, it must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). The court must accept all well-pled facts to be true and draw all reasonable inferences in favor of the plaintiff. *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citations omitted). However, the court does not need to accept legal conclusions drawn from the facts. *Id.* (citing *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008)).

Paragraphs 41, 49, 57, and 65 of the plaintiff's complaint allege that the Flamingo Properties Transfer and the Flamingo South Transfer were not for reasonably equivalent value.

The complaint does not contain merely bare bones allegations, but also contains the following facts which support the allegation that the transfers were not for reasonably equivalent value:

> In consideration for a $375,000 note payable over 5 years, and fringe benefits payable for 2-5 years, the Debtor transferred his membership interest in FP, with a value of at least $1,782,421.48, back to FP. At the time of the FP Transfer, the book value of the real property of FP was at least $3,564,842.96. The Debtor's interest, one-half, was worth at least $1,782,421.48. Additionally, FP was to receive net rents of $2,250,000.00 over the next 7 years.

Compl. ¶¶ 43, 59.

> In consideration for a $375,000 note payable over 5 years, and fringe benefits payable for 2-5 years, the Debtor transferred his membership interest in FS, with a value of at least $369,162.94, back to FS. At the time of the FS Transfer, the book value of the real property of FS was at least $738,325.88. The Debtor's interest, one-half, was worth at least $369,162.94. Additionally, FS was to receive net rents of $918,000.00 over the next 7 years.

Compl. ¶¶ 51, 67.

Paragraphs 30 through 33 of the complaint allege that, as a result of the transfers, the debtor became insolvent:

> 30. As a result of the Transfers, the Debtor became insolvent as defined by 28 U.S.C. § 3302, and N.C. Gen. Stat. § 39-23.2. Immediately after the Transfers, the assets of the Debtor, corresponding values (and lien(s), if applicable), and available claims of exemption, in late May 2015 were, upon information and belief:

> (a) real property located at 651 Fairlie Court, Wilmington, North Carolina 28412. Fair market value of $361,900.00 (New Hanover County tax value), first priority deed of trust with BB&T in the amount of $226,409.45, second priority deed of trust with BB&T in the amount of $17,891.50, claim of exemption under N.C. Gen. Stat. § 1C-1601(a)(1) in the amount of $35,000.00; net value of $82,599.05.

> (b) household goods with an approximate value of $3,500.00 (as shown on the Debtor's schedule B). These would be fully exempt under N.C. Gen. Stat. § 1C-1601(a)(4).

> (c) bank accounts with an aggregate value of less than $2,000.00. These monies would be fully exempt under N.C. Gen. Stat. § 1-362.

(d) one-half interest in Brike Management, LLC ("Brike"). Brike was a single-asset real estate company that owned real property located at 330 Military Cutoff Road, Suite A1, Wilmington, North Carolina 28405. Value of real property, $138,800.00 (New Hanover County tax value), lien of BB&T in the amount of $121,154.65; net value of $17,645.35; one-half of net value: $8,822.68.

(e) Promissory Note and other payables from FP and FS (see, Exhibits A & C) totaling approximately $361,248.00 in value (value as shown on the Debtor's amended 2015 income tax returns).

31. The value of the Debtor's assets, for purposes of 28 U.S.C. § 3302, and N.C. Gen. Stat. § 39-23.2, was $452,669.73 immediately after the Transfers.

32. The Debtor's liabilities immediately after the Transfer were, upon information and belief:

(a) personal guarantee of FP obligations to BB&T of approximately $1,638,157.05.

(b) personal guarantee of FS obligations to BB&T of approximately $4,491,674.13.

(c) Department of the Treasury – Internal Revenue Service, 2014 income taxes which totaled approximately $70,000.00 (a lien for this tax year was filed against the Debtor on May 4, 2016 in the amount of $82,478.46, see, Claims Register No. 4, amended August 6, 2020). A copy of this claim is attached hereto as Exhibit D.

(d) revolving credit card debt to American Express and BB&T that totaled approximately $9,000.00.

33. The total of the Debtor's liabilities, for purposes of 28 U.S.C. § 3302, and N.C. Gen. Stat. § 39-23.2, was $6,208,831.18 immediately after the Transfers.

Compl. ¶¶ 30-33.

The defendants argue that the plaintiff's valuations are incorrect. Valuation is a factual question, and questions of fact should not be resolved on a motion to dismiss. For the purposes of a Rule 12(b)(6) motion, the court must accept that the plaintiff's factual allegations are true. The court finds that the plaintiff did not merely recite the elements of the causes of action, but that the

plaintiff pled sufficient facts to plausibly support the conclusion that there was a lack of "reasonably equivalent value" and that the debtor was "insolvent."

## IV.    Liability of Cheshire

The sixth and seventh claims for relief are for recovery of the avoided transfers. Section 550(a) provides that

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a).

Claim six seeks a judgment against Flamingo Properties, Flamingo South, and Cheshire in the amount of the avoidable transfers, plus pre-judgment interest, pursuant to 11 U.S.C. § 550(a)(1). The plaintiff alleges that Flamingo Properties and Flamingo South were the initial transferees, but that the transfers were made for the benefit of Flamingo Properties, Flamingo South, and Cheshire.

Claim seven seeks a judgment against Cheshire in the amount of the value of the transfers, plus pre-judgment interest, pursuant to 11 U.S.C. § 550(a)(2). The plaintiff alleges, in the alternative, that Cheshire was an immediate transferee of the avoidable transfers as his membership interest increased from 50% to 100% as a result of the transfers.

The defendants argue in their motion to dismiss that Cheshire has no liability for any of the avoidance claims. First, the defendants argue that the initial transferees of Musselwhite's membership interest are Flamingo South and Flamingo Properties, not Cheshire, and thus Cheshire

cannot be liable under § 550(a)(1). Second, the defendants argue that Cheshire is not an immediate transferee.

When taking the allegations that have been incorporated by reference in causes of action six and seven as true, the court finds that the allegations plausibly state a claim for relief under 11 U.S.C. § 550 against Cheshire. The complaint plausibly alleges that Cheshire is either an entity for whose benefit such transfer was made or an immediate transferee of the avoidable transfers by virtue of his membership interest increasing from 50% to 100% as a result of the transfers. The motion to dismiss the six and seventh causes of action against Cheshire will be denied.

## V.    Motion to Withdraw the Reference

Last, the defendants argue that if this case is not dismissed, the reference of this adversary proceeding should be withdrawn. The defendants do not consent to the entry of a final judgment by this court, nor do the defendants consent to a jury trial being conducted by this court. Cheshire filed a proof of claim, but Flamingo Properties and Flamingo South have not filed claims in this bankruptcy case. The defendants argue that no claim is stated against Cheshire as a "transferee," and so although Cheshire has filed a proof of claim, that should not deprive Flamingo Properties and Flamingo South of their right to a jury trial on those claims. The defendants further argue that the district court should withdraw the reference to the entire case, rather than only with respect to the claims on which Flamingo Properties and Flamingo South are entitled to a jury trial.

The plaintiff takes the position that the district court is not required to withdraw the reference and argues that mandatory withdrawal is not applicable because the federal laws involved in this adversary proceeding arise under the Bankruptcy Code. Furthermore, the court should not permissively withdraw the reference because this adversary proceeding deals with core proceedings and will impact the bankruptcy estate. Finally, the plaintiff argues that withdrawing

the reference right now serves no practical purpose and if the case progresses to trial, the defendants could renew their motion at that time.

The decision of whether the reference should, or must, be withdrawn lies with the district court. Fed. R. Bankr. P. 5011; 28 U.S.C. § 157(d). Section 157(d) of title 28 of the United States Code provides that

> [t]he district court may withdraw, in whole or in part, any case or proceeding referred under this section, on its own motion or on timely motion of any party, for cause shown. The district court shall, on timely motion of a party, so withdraw a proceeding if the court determines that resolution of the proceeding requires consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce.

28 U.S.C. § 157(d). The motion for withdrawal of the reference this adversary proceeding will not be resolved by this court, but instead should be transmitted to the United States District Court for the Eastern District of North Carolina for review.

## CONCLUSION

**THEREFORE, IT IS ORDERED THAT**

1. The Motion to Dismiss the second, third, fourth, fifth, sixth, and seventh causes of action is hereby **DENIED**; and

2. The Motion for Withdrawal of this adversary proceeding shall be transmitted to the United States District Court for the Eastern District of North Carolina.

**END OF DOCUMENT**